562 F.2d 914
 MAYOR AND CITY COUNCIL OF BALTIMORE, a Municipal Corporation
and Board of School Commissioners of Baltimore
City, Appellees,
v.
F. David MATHEWS, Individually and as Secretary of the
United States Department of Health, Education, and Welfare,
Martin H. Gerry, Individually and as Acting Director, Office
for Civil Rights, United States Department of Health,
Education, and Welfare, United States Department of Health,
Education, and Welfare, an agency of the United States of
America, and Irvin N. Hackerman, Individually and as
Administrative Law Judge, United States Department of
Health, Education, and Welfare, Appellants,
NAACP Legal Defense and Educational Fund, Inc., Amicus Curiae.
Marvin MANDEL, Governor of the State of Maryland, State of
Maryland, Maryland State Board for Community Colleges, an
agency of the State of Maryland, Maryland Council for Higher
Education, an agency of the State of Maryland, Board of
Trustees of Morgan State University, an agency of the State
of Maryland, Board of Trustees of St. Mary's College of
Maryland, an agency of the State of Maryland, Board of
Trustees of the State Colleges of Maryland, an agency of the
State of Maryland, the University of Maryland, an agency of
the State of Maryland, Board of Trustees of the Community
College of Baltimore, an agency of the Mayor and City
Council of Baltimore, on behalf of itself and all other
Public Junior and Community Colleges of the various
political subdivisions lying within the State of Maryland, Appellees,
v.
UNITED STATES DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE,
an agency of the United States of America, F. David Mathews,
Individually and in his official capacity as Secretary of
the United States Department of Health, Education, and
Welfare, Martin H. Gerry, Individually and in his official
capacity as Acting Director of the Office for Civil Rights
of the United States Department of Health, Education, and
Welfare, Dewey E. Dodds, Individually and in his official
capacity as Acting Deputy Director of the Office for Civil
Rights of the United States Department of Health, Education,
and Welfare, Roy McKinney, Individually and in his official
capacity as Acting Director of the Higher Education Division
of the Office for Civil Rights of the United States
Department of Health, Education, and Welfare, Burton Taylor,
Individually and in his official capacity as Chief of the
Program and Policy Branch of the Higher Education Division
of the Office for Civil Rights of the United States
Department of Health, Education, and Welfare, St. John
Barrett, Individually and in his official capacity as Acting
General Counsel of the United States Department of Health,
Education, and Welfare, and Ronald Gilliam, Individually and
in his official capacity as Acting Regional Civil Rights
Director for Region III of the Office for Civil Rights of
the United States Department of Health, Education, and
Welfare, Appellants,
NAACP Legal Defense and Educational Fund, Inc., Amicus Curiae,
The American Council on Education, the Association of
American Universities, the National Association of State
Universities and Land Grant Colleges, the American
Association of State Colleges and Universities and the
American Association of Community and Junior Colleges; the
National Association of Attorney Generals; and The States of
Alaska, Arizona, Connecticut, Delaware, Florida, Idaho,
Illinois, Iowa, Kansas, Louisiana, Michigan, Mississippi,
Missouri, Montana, Nebraska, Nevada, New Hampshire, New
Mexico, New York, North Carolina, Ohio, Oregon, South
Dakota, Tennessee, Texas, Utah, Washington, West Virginia,
Wisconsin, and Wyoming, and the Commonwealth of Kentucky and
Virginia, Amici Curiae,
The Commonwealth of Pennsylvania, Amicus Curiae,
Trustees of the California State University and Colleges and
Regents of the University of California, Amici Curiae.
 Nos. 76-1493, 76-1494.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 14, 1977.
Decided Aug. 9, 1977.
 
 Cynthia L. Attwood and Brian K. Landsberg, Attys., Appellate Section, Dept. of Justice, Washington, D. C. (J. Stanley Pottinger, Asst. Atty. Gen., Civ. Rights Div., Dept. of Justice, Marie E. Klimesz, Atty., Dept. of Justice, Frank K. Krueger, Jr., Atty., Dept. of HEW, Washington, D. C., on brief), for appellants in 76-1493 and 76-1494.
 E. Stephen Derby, Baltimore, Md. (David F. Tufaro, Benjamin L. Brown, City Sol., William Hughes, Chief Sol., Elise M. J. Mason, Asst. City Sol., William L. Marbury, Baltimore, Md., on brief), for appellees in 76-1493.
 Francis B. Burch, Atty. Gen. of Md., Walter G. Lohr, Jr., Asst. Atty. Gen. of Md. (Henry R. Lord, Deputy Atty. Gen. of Md., and David H. Feldman, Asst. Atty. Gen. of Md., Baltimore, Md., on brief), for appellees in 76-1494.
 Jack Greenberg, James M. Nabrit, III, Drew S. Days, III, Attys., New York City, for NAACP Legal Defense and Educational Fund, Inc., on brief urging reversal in 76-1493 and 76-1494.
 George W. Liebmann and Frank, Bernstein, Conaway & Goldman, Baltimore, Md., of counsel; Sheldon Elliot Steinbach, Atty., Washington, D.C., for The American Council on Education and The American Assn. of Community and Junior Colleges; John Holt Myers and Williams, Myers & Quiggle, Attys., Washington, D.C., for The Association of American Universities and The American Assn. of State Colleges and Universities; Gerald Roschwalb, Atty., Washington, D.C., for Nat. Assn. of State Universities and Land Grant Colleges; Avrum Gross, Atty. Gen. of Alaska, Richard M. Burnham, Asst. Atty. Gen., Juneau, Alaska, Bruce E. Babbitt, Atty. Gen. of Ariz., Phoenix, Ariz., Carl R. Ajello, Atty. Gen. of Conn., Bernard F. McGovern, Jr., Asst. Atty. Gen., Hartford, Conn., Richard R. Wier, Jr., Atty. Gen. of Del., Dover, Del., Robert L. Shevin, Atty. Gen. of Fla., Tallahassee, Fla., Wayne L. Kidwell, Atty. Gen. of Idaho, Boise, Idaho, William J. Scott, Atty. Gen. of Ill., Springfield, Ill., Richard C. Turner, Atty. Gen. of Iowa, Des Moines, Iowa, Curt T. Schneider, Atty. Gen. of Kan., Donald R. Hoffman, Atty. Gen. of Kan., Donald R. Hoffman, Asst. Atty. Gen., Topeka, Kan., William J. Guste, Jr., Atty. Gen. of La., New Orleans, La., Vanue B. Lacour, Sp. Asst. Atty. Gen., Frank J. Kelley, Atty. Gen. of Mich., Lansing, Mich., A. F. Summer, Atty. Gen. of Miss., Jackson, Miss., John C. Danforth, Atty. Gen. of Mo., Jefferson City, Mo., Robert L. Woodahl, Atty. Gen. of Mont., Charles E.Erdmann, Asst. Atty. Gen., Helena, Mont., Paul L. Douglas, Atty. Gen. of Neb., HaMosher, Asst. Atty. Gen., Lincoln, Neb., Robert List, Atty. Gen. of Nev., James Thompson, Cheif Deputy Atty. Gen., Carson City, Nev., David H. Souter, Atty.Gen. of N.H., Concord, N.H., Toney Anaya, Atty. Gen. of N.M., Albuquerque, N.M., Louis J. Lefkowitz, Atty. Gen. of N.Y., New York City, Rufus L. Edmisten, Atty. Gen. of N.C., Raleigh N.C., William J. Brown, Atty. Gen. of Ohio, Richard J. Dickinson, Sp. Asst. Atty. Gen., Columbus, Ohio, Lee Johnson, Atty. Gen. of Or., James W. Durham, Deputy Atty. Gen., Michael W. Gillette, Sol. Gen., Salem, Or., William Janklow, Atty. Gen., of S.D., Pierre, S.D., R. A. Ashley, Jr., Atty. Gen. of Tenn., Richard Lodge, Asst. Atty. Gen., Nashville, Tenn., John L. Hill, Atty. Gen. of Tex., David M. Kendall, First Asst. Atty. Gen., Elizabeth Levatino, Asst. Atty. Gen., M. Lynn Taylor, Asst. Atty. Gen., Austin Tex., Vernon B. Tomney, Atty. Gen. of Utah, Salt Lake City, Utah, Slade Gorton, Atty. Gen. of Wash., James B. Wilson, Senior Asst. Atty. Gen. for the Univ. of Wash., Olympia, Wash., Chauncey H. Browning, Jr., Atty. Gen. of W. Va., Charleston, W. Va., Bronson C. La Follette, Atty. Gen. of Wis., David J. Hanson, Deputy Atty. Gen., Madison, Wis., E. Frank Mendicino, Atty. Gen., of Wyo., Cheyenne, Wyo., for their respective States; Robert F. Stephens, Atty. Gen. of Ky., Robert L. Chenoweth, Asst. Atty. Gen., Frankfort, Ky., Andrew P. Miller, Atty. Gen. of Va., Walter H. Ryland, Asst. Atty. Gen., Richmond, Va., for their respective Commonwealths, on brief urging affirmance in 76-1494.
 Robert P. Kane, Atty. Gen. of Pa., J. Justin Blewitt, Jr., Deputy Atty. Gen., Chief, Civil Litigation, Allen C. Warshaw, Deputy Atty. Gen., Harrisburg, Pa., for Cmwlth. of Pa., on brief urging affirmance in 76-1494.
 Evelle J. Younger, Atty. Gen., of Cal., N. Eugene Hill, Asst. Atty. Gen., James D. Clayton, Deputy Atty. Gen., Sacramento, Cal., Attys., for Trustees of Cal. State Univ. and Colleges and Regents of Univ. of Cal.; Donald L. Reidhaar, Gen. Counsel, Berkeley, Cal., for Regents of Univ. of Cal., James H. Holst, Asst. Gen. Counsel, Berkeley, Cal., on brief urging affirmance in 76-1494.
 Before HAYNSWORTH, Chief Judge, and WINTER, CRAVEN,* BUTZNER, RUSSELL, WIDENER and HALL, Circuit Judges, sitting en banc.
 WINTER, Circuit Judge:
 
 
 1
 These consolidated appeals began, respectively, as two separate actions by the Mayor and City Council of Baltimore (No. 76-1493) and the Governor of Maryland and several Maryland state educational agencies (No. 76-1494) against the United States Department of Health, Education, and Welfare and several of that agency's officials (HEW). Their complaints sought declaratory and injunctive relief against HEW's alleged arbitrary and illegal methods of enforcement of Title VI of the 1964 Civil Rights Act, §§ 601 et seq. of the Act, 42 U.S.C. §§ 2000d et seq. At the time that Maryland sued, HEW was about to initiate administrative enforcement of Title VI, i. e., administrative proceedings which might result in the termination of outstanding grants of federal funds and the denial of new grants, with respect to Maryland's system of higher education. When Baltimore sued, HEW's administrative proceedings which might result in the termination of federal funds with respect to Baltimore's elementary and secondary schools had been initiated and hearings were scheduled to begin approximately one month after the date that suit was filed.
 
 
 2
 The district court granted injunctive relief, holding that HEW had acted in contravention of Title VI in seeking compliance therewith by (1) failing "arbitrarily and whimsically" to attempt to secure compliance with Title VI by voluntary means, and (2) "vindictively" refusing to assume a programmatic approach in the negotiation process. HEW was enjoined (1) from proceeding with the pending administrative enforcement proceedings against Baltimore and Maryland, (2) from deferring consideration of applications for future funding, and (3) from reinstituting administrative enforcement proceedings until HEW had, inter alia, (a) adopted and promulgated administrative regulations, effective uniformly throughout the United States, setting forth specific standards for compliance with Title VI in the administration of programs of federal financial assistance to institutions of higher education, (b) made a separate and specific analysis of each statutory aid program to determine the existence of noncompliance in the administration of such program, and (c) specified the actions which, in HEW's view, are necessary to remedy the alleged noncompliance and specified standards by which the existence of noncompliance will be determined. Mandel v. U. S. Dept. of Health, Education and Welfare, 411 F.Supp. 542 (D.Md.1976).
 
 
 3
 We agree that Maryland is entitled to injunctive relief, but not in the form granted by the district court. We disagree that Baltimore is entitled to any relief. We think that the district court should have concluded that, on the record before it, it would have been improper to grant relief in Baltimore's case. We reach these conclusions for the reasons that follow.I.
 
 
 4
 Title VI of the 1964 Civil Rights Act, §§ 601 et seq. of the Act, 42 U.S.C. §§ 2000d et seq., directs that:
 
 
 5
 No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
 
 
 6
 42 U.S.C. § 2000d. In order to implement the legislative mandate, federal agencies empowered to extend financial assistance are required to issue "rules, regulations, or orders of general applicability" to carry out the objectives of § 2000d. 42 U.S.C. § 2000d-1. If recipients of federal aid fail to abide by or to comply with these rules and regulations, the relevant federal agency may terminate outstanding grants, refuse to renew them, or halt consideration of applications for additional funding. Id. However, any such action must be preceded by: (1) notice of alleged noncompliance to the offending recipient; (2) a determination that compliance cannot be secured by voluntary means; (3) an express finding on the record, after an opportunity for hearing, that the recipient is not, in fact, complying with the law; and (4) a full written report to committees of the House and Senate having jurisdiction over the program or activity receiving federal aid, within which discrimination is alleged to have occurred. Id. Even after these conditions are met, § 602, 42 U.S.C. § 2000d-1, provides that "(n)o such action (terminating or otherwise restricting federal financial assistance) shall become effective until thirty days have elapsed after the filing of such report." Section 603 of the Act, 42 U.S.C. § 2000d-2, provides further that any person aggrieved by such action (including any state or political subdivision thereof) may obtain judicial review under the Administrative Procedure Act, and that no such action shall be deemed "committed to unreviewable agency discretion." The Administrative Procedure Act, in turn, allows the federal agency or federal courts to postpone or stay agency action pending judicial review. It also allows the federal courts to set aside such action in certain specified instances. 5 U.S.C. §§ 705, 706(2).
 
 
 7
 Given this comprehensive scheme of administrative adjudication, congressional oversight, and judicial review, it is clear that the City of Baltimore and the State of Maryland, before bringing the instant lawsuit, were not faced with an immediate threat of losing federal financial assistance.[1] It is also clear that the district court invoked the extraordinary remedy of prior restraint against administrative proceedings which were far from complete, and were subject to review (as a matter of right) before taking effect.
 
 
 8
 By issuing an interlocutory injunction, the district court ignored a "long settled" rule of judicial administration and its first corollary: (1) a litigant "is (not) entitled to judicial relief for any supposed or threatened injury until the prescribed administrative remedy has been exhausted";[2] and (2) "judicial intervention in uncompleted administrative proceedings, as distinguished from judicial checking by statutorily-established methods of review," is strongly disfavored as a matter of general practice.[3] The district court justified its action by invoking a recognized exception to the foregoing rules: when an agency acts in "brazen" defiance of its statutory authorization, the courts will not wait for the underlying proceedings to run their course.[4] Rather, the federal courts will intervene to preserve the status quo, prevent the infringement of substantial rights that might otherwise be sacrificed, and protect against the subversion of congressional policy.[5] Two decisions exemplify this doctrine with particular clarity: Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958) and our unanimous in banc decision in Taylor v. Cohen, 405 F.2d 277 (4 Cir. 1968).
 
 
 9
 In Leedom, the Supreme Court upheld the propriety of a prior restraint against a certification proceeding brought by the National Labor Relations Board. Contrary to express language contained in § 9(b)(1) of the National Labor Relations Act, 29 U.S.C. § 159(b)(1), the Board attempted to certify a mixed professional/nonprofessional bargaining unit. The certification was attacked in federal court, and the NLRB countered by arguing that its determination was not a "final order" otherwise subject to judicial review. The Court, however, disagreed:
 
 
 10
 This suit is not one to "review," in the sense of that term as used in the Act, . . .. Rather, it is one to strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in the Act. 358 U.S. at 188, 79 S.Ct. at 184 (emphasis added).
 
 
 11
 In Taylor, like the instant case, plaintiffs sought to restrain the termination of federal financial assistance under Title VI. HEW had determined that a school district's refusal to adopt a complete modification of its "freedom of choice" desegregation plan constituted a continuing violation of the statute. HEW therefore initiated administrative proceedings, after the appropriate notices and determinations, with the objective of terminating federal funding. Plaintiffs, the parents of affected school children, sought and received an injunction from the district court. We reversed, however, holding judicial intervention to be unwarranted and inappropriate, given the fact that "there has been no showing that HEW disregarded provisions of the Civil Rights Act of 1964." 405 F.2d at 281 (emphasis added).
 
 
 12
 We believe (along with the district court) that, consistent with Leedom and Taylor, the principal question to be decided is whether, on this record, the City and the State have demonstrated that HEW has acted ultra vires in its efforts to effect Title VI compliance by the City and State. If HEW acted erroneously, but within the boundaries of the enabling statute, its mistakes can be corrected only through ordinary congressional and judicial review. On the other hand, if the agency has exceeded its statutory authority, the district court was fully authorized to impose a prior restraint.
 
 II.
 
 13
 We conclude that, vis a vis the State of Maryland, HEW acted ultra vires. Accordingly, HEW's acts and omissions firmly established federal jurisdiction and justify the award of injunctive relief, although not in the form granted by the district court. We conclude that, vis a vis the City of Baltimore, while HEW may have committed other errors a question that we may not presently properly decide it has not acted in excess of the statute. Accordingly, federal jurisdiction was lacking and no relief should have been awarded.
 
 
 14
 A. Generally.
 
 
 15
 As we have already indicated, HEW, or any other agency subject to Title VI, must follow a progression before federal aid may be terminated, spelled out, in part, in the text of § 602 and fixed, in part, by the agency's regulations which § 602 authorizes and directs the agency to promulgate. Section 602 states that termination must be preceded by administrative hearings which, in turn, must be preceded by efforts at achieving voluntary compliance through negotiation and consultation. 42 U.S.C. § 2000d-1.
 
 
 16
 Faithful to the mandate of § 602, HEW has promulgated a detailed regulation codified in 45 C.F.R. Part 80. The regulation applies to "any program for which federal financial assistance is authorized to be extended to a recipient under a law administered by (HEW)," including all of the financial assistance for various educational programs outlined in an appendix to Part 80. 45 C.F.R. § 80.2. The regulation also enumerates proscribed acts of discrimination, requires assurances of equal treatment before any grant is awarded, and gives illustrative examples of how certain deficient programs can be corrected and brought into compliance with the statute. 45 C.F.R. §§ 80.3, 80.4, 80.5.
 
 
 17
 Most important (for purposes of this appeal), the regulation requires HEW officials to seek the cooperation and aid of recipients in bringing about compliance and "to help (recipients) comply voluntarily" with Title VI and HEW specifications. 45 C.F.R. § 80.6(a). If investigation by HEW indicates noncompliance, HEW must resolve the matter "by informal means whenever possible." 45 C.F.R. § 80.7(d)(1). Administrative hearings are initiated only when efforts at voluntary compliance break down, in accord with the statute itself. 45 C.F.R. §§ 80.8-80.11.
 
 
 18
 A significant aspect of the effort to facilitate voluntary compliance is the requirement that HEW officials instruct recipients how to comply:
 
 
 19
 (b) Forms and instructions. The responsible Department officials shall issue and promptly make available to interested persons forms and detailed instructions and procedures for effectuating this part (i. e., 45 C.F.R. Part 80). 45 C.F.R. § 80.12(b).
 
 
 20
 Pursuant to this self-imposed obligation, HEW has published an elaborate set of guidelines governing Title VI compliance by elementary and secondary schools. 45 C.F.R. §§ 80.4(c) and 181; Alabama State Teachers Ass'n v. Alabama Public School & College Authority, 289 F.Supp. 784, 787 n.3 (M.D.Ala.1968), summarily aff'd, 393 U.S. 400, 89 S.Ct. 681, 21 L.Ed.2d 631 (1969). It has failed, however, to take comparable action with respect to higher education.
 
 
 21
 B. The State of Maryland.
 
 
 22
 HEW's compliance efforts with respect to Maryland are directed solely to Maryland's system of higher education; specifically, the various branches of Maryland's college and university system. HEW's failure to adopt guidelines applicable to higher education in Maryland has two vital effects. First, in a practical sense, HEW's omission completely undermines the effectiveness of any effort towards Title VI compliance, either through negotiation or through administrative hearings. Neither party, nor the administrative law judge, has any working knowledge of what constitutes "compliance," thereby reducing the entire process to a meaningless exchange of theory rather than a determination of fact. Second, in a legal sense, HEW's failure renders its action to terminate financial assistance, taken to enforce Title VI vis a vis the State, ultra vires and without the force of law.
 
 
 23
 Our conclusion that HEW's failure renders its beginning administrative termination proceedings ultra vires stems from the following reasons. The statute requires negotiations looking to voluntary compliance as a first step. It also requires that the appropriate federal agency (here HEW) promulgate regulations to that effect. HEW has complied by adopting 45 C.F.R. Part 80, and binding itself (by virtue of § 80.12(b)) to assist in voluntary compliance and to facilitate negotiations through the issuance of "compliance guidelines" or instructions. With regard to higher education, it has failed to do so, and thus it has violated its own regulation.[6] Since the regulation, in turn, was adopted pursuant to a statutory mandate, we think that the regulation is elevated to the status of the statute and violation of the regulation becomes a violation of the statute itself. Since HEW has forced the State through negotiations and into the administrative hearings without the guidelines which the statute thus requires, HEW's conduct is clearly ultra vires and subject to prior restraint. We discuss, at a later point what form the prior restraint should take.
 
 
 24
 C. The City of Baltimore.
 
 
 25
 The City of Baltimore stands on a different footing from the State. Baltimore's compliance with Title VI is sought with respect to primary and secondary schools, the subject of detailed treatment by existing HEW guidelines and directives.[7] Nonetheless, the district court concluded that, with respect to Baltimore City, relief was warranted because of the quality and quantity of HEW's negotiating efforts. In addition, the district court criticized HEW's systematic approach to school desegregation and its failure to negotiate on a school-by-school or program-by-program basis. Thus, the district court concluded that HEW had acted ultra vires, that it had jurisdiction, and that it was proper to decree a prior restraint against further proceedings.
 
 
 26
 The quantity or quality of negotiations by HEW requires little comment. The record reveals that there were extensive negotiations extending over a two year period.[8] The record suggests that if any party was responsible for the various delays and the ultimate breakdown of communication, it was more likely the City. Nonetheless, we note that nothing in the language of Title VI or HEW's own regulation specifies the quantity or quality of attempts to negotiate voluntary compliance. Therefore, we decide only that the quantity and quality of the negotiations are not reviewable now; we do not pass on the question of whether the negotiations are reviewable at another time and, if so, whether the instant negotiations were substandard. The district court's judgment, based upon a lengthy review of the facts and its own assessment of blame for the impasse which has been reached, should not have been made. The doctrine exemplified by Leedom and Taylor, creating an exception to the general rule against prior restraint of reviewable administrative action, is a narrow one confined to conduct that is clearly ultra vires. Boire v. Greyhound Corp., 376 U.S. 473, 481-82, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964).[9] Factual judgments of the type reached by the district court should be made first, if at all, by the administrative tribunal (subject, of course, to ordinary channels of judicial review).
 
 
 27
 There remains for consideration the contention that HEW violated Title VI, and acted ultra vires, by failing to negotiate with the City on a school-by-school or a program-by-program basis. This same contention was raised in Maryland's case, but in view of our basis of decision we found it unnecessary to discuss it there. This contention is grounded upon § 602 of the Act, which provides, inter alia, that any termination or refusal of federal financial assistance
 
 
 28
 be limited to the particular political entity, or part thereof, or other recipient as to whom . . . a finding (of noncompliance) has been made and, shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found . . . 42 U.S.C. § 2000d-1 (emphasis added).
 
 
 29
 We do not view § 602 as requiring negotiations on a programmatic basis. Its language is directed solely to the issue of remedy, once negotiations have failed and a finding of noncompliance has been made (after administrative proceedings with full opportunity to be heard). Title VI is a remedial rather than a punitive statute. It was designed to eliminate the financial participation of the federal government in illegal discrimination.[10] At the same time, because federal aid has taken on increased significance in the funding of public education, it provides an economic incentive to end discrimination without resort to the judicial process.[11] Section 602, as we view it, provides limitations on the cutoff of federal funds designed to implement the statute's remedial nature. Once a finding of noncompliance has been made, funds are terminated only to the extent that they are used in, or support programs which practice discrimination. Other programs or activities free from the taint of unequal treatment, may not be condemned along with the blameworthy. Federal funds flowing to these programs and to their innocent beneficiaries, must not be terminated.
 
 
 30
 Board of Public Instruction of Taylor County, Fla. v. Finch, 414 F.2d 1068 (5 Cir. 1969), relied upon the district court, does not mandate programmatic negotiation. Indeed, it supports the view of § 602 which we now take. In that case, HEW found, after appropriate hearings, that a local school district maintained racially identifiable schools and a segregated faculty. The agency proceeded to terminate all federal funds flowing from it to the district in question. HEW made no determination whether its order should have been restricted to one or more programs receiving federal funds (rather than blindly extending termination to all classes of activity benefiting from federal financial assistance).
 
 
 31
 The court held that under a proper reading of § 602, the burden of limiting the effects of termination of federal funds rested on HEW, and that HEW was required to tailor its sanction only to those programs found to be infected by discrimination.
 
 
 32
 As we read Taylor County, its rationale depends upon the premise, with which we agree, that the "programmatic limitation" of § 602 applies solely to the findings which HEW may make as to the need for sanctions and the termination which HEW may order, but it has no application to the method by which HEW shall seek to negotiate voluntary compliance. Indeed, Taylor County almost decides the instant case, because, in dealing with HEW's argument that § 602 imposed no duty on it to make findings of fact for each program but rather created an affirmative defense to the recipient to show that some programs were untainted, the court stated:
 
 
 33
 The argument that the statute speaks not to the administrative agency terminating funds, but to the political entity whose funds are threatened, runs afoul of the language of the statute itself. The statute speaks to the "effect" of an order, not to its prerequisites. It states that termination "shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found." 414 F.2d at 1076. (Emphasis supplied in part.)Later in its opinion, it made two additional statements which are relevant here:
 
 
 34
 Limitations on the termination power are not primarily for the benefit of the political agency whose funds are withheld, but for the potential recipients of federal aid. 414 F.2d at 1077.
 
 
 35
 (T)he administrative agency seeking to cut off federal funds must make findings of fact indicating either that a particular program is itself administered in a discriminatory manner, or is so affected by discriminatory practices elsewhere in the school system that it thereby becomes discriminatory. Only in this way can a reviewing court know that the effects of the order entered by the agency have been limited to programs not in compliance with the Civil Rights Act. 414 F.2d at 1079. (Emphasis supplied.)
 
 
 36
 Thus, we are persuaded that HEW had no obligation to negotiate voluntary compliance on a programmatic basis as a condition precedent to the initiation of administrative termination hearings. It therefore did not act ultra vires in failing so to negotiate.
 
 
 37
 While we do not question that Baltimore City (and the State of Maryland) would prefer to negotiate on a programmatic basis, the law does not require it. The prior restraint should not have been granted and the administrative hearings should have been allowed to proceed. By the same token, we think that it would be inappropriate for us to express any view on HEW's alternative contention that Taylor County places an unjustifiably restrictive view on the meaning of a terminable "program" under § 602. Note, Board of Public Instruction v. Finch: Unwarranted Compromise of Title VI's Termination Sanction, 118 U. of Pa.L.Rev. 1113 (1970).
 
 
 38
 D. Relief in Maryland's Case.
 
 
 39
 Although purporting to be a preliminary injunction, the decree entered by the district court effectively terminates the litigation. We do not fault the district court on that score, but we think that the decree it entered must be revised to accomplish two purposes: first, to make it conform to the specific duty imposed on HEW that we conclude has not been carried out, and, second, to fix a timetable in which HEW should and must bring itself into compliance with its own regulation and proceed with the enforcement of Title VI. With regard to the latter, the district court, while enjoining HEW from proceeding with the administrative hearings until HEW had taken certain affirmative steps, fixed no time schedule in which HEW should proceed with the enforcement of Title VI against Maryland if HEW persists in the conclusion, which it has already reached, that Maryland is not in compliance with the statute. With regard to a timetable, we take our cue from the order entered April 1, 1977 by the United States District Court for the District of Columbia in Adams v. Califano, 430 F.Supp. 118 (D.D.C.1977).[12]
 
 
 40
 Thus, we think that the revised decree to be entered by the district court should order:
 
 
 41
 1. HEW to cease and desist from initiating or taking any steps towards the initiation of any and all administrative proceedings with respect to alleged noncompliance by the State of Maryland with Title VI, or HEW regulations promulgated thereunder, until the following conditions set forth in paragraphs 2 through 4 have been fulfilled.
 
 
 42
 2. HEW, within 90 days from the date of the district court's order, to transmit to the State of Maryland, and to serve upon the district court, final guidelines or criteria specifying the ingredients of an acceptable higher education desegregation plan for Maryland.
 
 
 43
 3. HEW to require Maryland to submit, within 60 days of receipt by Maryland of the final guidelines or criteria, a revised desegregation plan.
 
 
 44
 4. HEW to accept or reject such submission by Maryland within 120 days thereafter.
 
 
 45
 The order should further provide that, during the periods of time subsequent to HEW's fulfillment of paragraph 2 hereof and until compliance by Maryland with Title VI has been achieved, nothing contained therein shall be construed to relieve the parties of their obligation, under Title VI and HEW regulations, to negotiate to effect voluntary compliance by Maryland. The order should further provide that if Maryland shall have failed to submit a revised desegregation plan by the date specified in paragraph 3 of the order, the preliminary injunction therein granted shall automatically be vacated.
 
 
 46
 No. 76-1493 REVERSED.
 
 
 47
 No. 76-1494 VACATED AND REMANDED.
 
 
 48
 WIDENER, Circuit Judge, concurring in part and dissenting in part:
 
 
 49
 I would affirm the injunctions entered by the district court in both cases under review, for somewhat different reasons than have heretofore been expressed.
 
 
 50
 In its Title VI enforcement efforts in these cases, the Department of HEW has attempted to negotiate school desegregation plans with the broad remedial discretion of a district court acting under the Fourteenth Amendment. See Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). In so doing, the agency has, in my view, failed to comply with a basic statutory prerequisite to Title VI enforcement proceedings, the prescription that "termination" of funds be "effected" only after a finding of a "failure to comply with such requirements," meaning, of course, with "rules, regulations, or orders of general applicability," which are not effective until approved by the President. Title VI, § 602, 42 U.S.C. § 2000d-1.
 
 
 51
 This statutory language manifests at least three distinct and important concerns of Title VI; that requirements of uniform, nationwide applicability be adopted;[1] that these requirements be issued under the direct authority and approval of the President, who is in immediate contact with the political process and directly accountable to the public; and that compliance efforts be confined to violations of "such" (see § 2000d-1) specific rules, regulations, or orders, thus avoiding what the majority opinion terms "a meaningless exchange of theory rather than a determination of fact."
 
 
 52
 It is apparent that such a "meaningless exchange of theory" has occurred on both the City and State levels here, because of HEW's failure both to promulgate identifiable Title VI requirements, and to confine its compliance efforts to insistence on conformity with properly adopted nationwide standards. This failure constitutes, in both cases, the type of clear violation of a statutory mandate that will justify injunctive relief without resort to an exhaustion of administrative remedies. Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958).I.
 
 State of Maryland
 
 53
 Little more need be said of HEW's approach to higher education under Title VI. The agency had clearly failed to promulgate "rules, regulations, or orders of general applicability" with respect to state systems of higher education. HEW's Title VI regulations scarcely mention higher education, and even then say little more than that an assurance of compliance with unspecified, regulatory "requirements" must be provided. 45 C.F.R. § 80.4(a), (d). I am not as troubled as the majority by the lack of informal guidelines on the subject, a fact it obviously deems significant;[2] the more basic problem for me lies in the lack of formally adopted, nationally uniform, standards approved by the President. This lack of statutorily required regulations justified the district court in issuing its injunction despite the State's failure to exhaust administrative remedies.[3] See Leedom, supra.
 
 II.
 City of Baltimore
 
 54
 HEW has issued regulations of general applicability with respect to primary and secondary schools. In 45 C.F.R. § 80.4(c), the regulation applicable to this case, HEW has stated that a school system will be deemed in compliance with Title VI if it "(2) submits a plan for the desegregation of such school or school system which the responsible Department official determines is adequate to accomplish the purposes of the Act and this part, at the earliest practicable time, and provides reasonable assurance that it will carry out such plan. . . ."
 
 
 55
 This regulation fails to identify to any meaningful extent when a school system is not in compliance with Title VI, and what it must do to achieve compliance. Rather, it vests in HEW a broad remedial discretion in defining an acceptable desegregation plan, the exercise of which can only result in different standards of compliance with Title VI on a case by case basis. That is not what § 2000d-1 contemplates. If requirements are to be imposed, the violation of which can result in a termination of federal financial aid, they must be in the form of publicly issued rules, regulations or orders of nationwide applicability, approved by the President.[4]
 
 
 56
 Judged by this standard, which is required by statute, the regulation applied in this case, 45 C.F.R. § 80.4(c)(2), cannot be viewed as adequate. It sets no identifiable, uniform standards of compliance with Title VI, only the hopelessly vague standard of what HEW deems "adequate to accomplish the purposes of the Act." It is the content of this phrase what HEW in substance deems "adequate" that must be expressed in generally applicable regulations issued in an open and public manner. Only then will determinations of compliance reach the level of objectivity contemplated by Title VI.
 
 
 57
 The record in these cases supports the inescapable conclusion that, from the inception of HEW's Title VI enforcement effort against Maryland and Baltimore City, beginning with Adams v. Richardson, 356 F.Supp. 92 (D.D.C.1973), aff'd. as modified, 480 F.2d 1159 (D.C.Cir.1973), the central, and really the only, theme has been the attainment of a racial balance in schools in which more than a 20% disproportion exists between minority enrollment and minority population in the entire school district,[5] which in Baltimore is 70%.
 
 
 58
 Thus, in its Amended Notice of Opportunity for Hearing, setting forth enumerated grounds of noncompliance with Title VI on the part of Maryland and Baltimore City, HEW charged that 109 of the 210 public schools in Baltimore "had disproportionate minority enrollments in that they were greater than 90% minority," and that 51 schools "had disproportionate white enrollments, in that they were less than 50% minority."
 
 
 59
 The validity or applicability of such racial quotas in school desegregation cases need not be debated here. Cf. Swann, supra. It suffices for present purposes to observe that at no time has HEW incorporated such quotas, even in general terms, into a regulation of general applicability, approved by the President, as Title VI requires. If quotas at all, or a 20% disproportion, are to be the Title VI standard in school cases, it must be so for the entire nation, not just for the City of Baltimore.
 
 
 60
 For these reasons, I would hold that HEW acted ultra vires in its dealings with Baltimore City in No. 76-1493, and I respectfully dissent from the opinion of the majority in that case.
 
 
 61
 Judges DONALD RUSSELL and K. K. HALL have authorized me to state that they concur in this opinion. Judge K. K. Hall has also asked me to state that he reserves the right to express further his separate views.
 
 
 62
 K. K. HALL, Circuit Judge, concurring in part and dissenting in part:
 
 I.
 STATE OF MARYLAND
 
 63
 As to the State of Maryland (Appeal No. 76-1494), I concur with that portion of the majority opinion which holds in substance that HEW acted ultra vires due to its failure to adopt guidelines for Title VI compliance by institutions of higher education in Maryland, thereby rendering the voluntary and administrative compliance phases of the Title VI enforcement a "meaningless exchange of theory rather than a determination of fact."
 
 
 64
 I dissent from the failure of the majority to also hold that HEW must utilize a programmatic approach to voluntary compliance with the State of Maryland prior to initiation of administrative enforcement and from the dictum in Part II.C. of the majority opinion which implies that HEW has no such duty.
 
 
 65
 I further dissent from the relief which the majority holds is proper for the State of Maryland. In lieu thereof, I would affirm the injunction entered by the district court.
 
 II.
 CITY OF BALTIMORE
 
 66
 As to the City of Baltimore (Appeal No. 76-1493), I dissent from the majority opinion which narrowly holds that § 602 of Title VI, 42 U.S.C. § 2000d-1, alone does not require a programmatic analysis of alleged Title VI noncompliance during voluntary negotiations prior to initiation of administrative enforcement proceedings, and which therefore holds that HEW did not act ultra vires by its conduct up to and including the commencement of administrative enforcement.
 
 
 67
 I further dissent from the reversal of the injunction entered in favor of the City of Baltimore, and instead would also affirm the injunction entered by the district court.
 
 III.
 PROGRAMMATIC APPROACH
 
 68
 Under Title VI, 42 U.S.C. § 2000d, et seq., and the applicable regulations, 45 C.F.R., Parts 80 and 81, the compliance procedures are divided into three phases: (1) the voluntary compliance phase; (2) the administrative hearing phase; and (3) the phase when actual fund termination occurs. I would hold that under Title VI, HEW must, at each of the three phases, specify with particularity, to the extent reasonably possible, each program or programs that it believes to be out of compliance with Title VI.
 
 
 69
 I believe this result is compelled by the statutory and regulatory framework of Title VI, its legislative history, by precedent, and certainly by logic itself. Since HEW admittedly did not follow a programmatic analysis during the voluntary enforcement stage and prior to its efforts to seek and to pursue administrative enforcement seeking termination of all federal funding with respect to the State of Maryland and the City of Baltimore respectively, I would hold that the district court correctly assumed jurisdiction in both civil actions filed by the State and the City, respectively, under the established exception to administrative exhaustion doctrine set forth in Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958); see also Taylor v. Cohen, 405 F.2d 277, 281 (4th Cir. 1968).
 
 
 70
 When the entire statutory and regulatory framework of Title VI is closely analyzed, it is clear that a programmatic approach to Title VI compliance must be followed in all phases of compliance.[1] The congressional prohibition against discrimination supports this view:
 
 
 71
 No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
 
 
 72
 42 U.S.C. § 2000d (emphasis added).
 
 
 73
 The parallel regulation contains similar emphasis barring ". . . discrimination under any program or activity receiving Federal financial assistance from (HEW)." 45 C.F.R. § 80.1 (emphasis added).
 
 
 74
 The compliance section of Title VI and its parallel regulation similarly require voluntary compliance by the parties in an effort to end discrimination in programs receiving federal funding, and failing in that, termination provisions for such funding are provided. Again, these provisions are ". . . limited to the particular political entity, or part thereof, or other recipient as to whom such a(n) (administrative finding of discrimination) has been made and, shall be limited in its effect to the particular program, or part thereof, in which such noncompliance (with Title VI) has been so found, . . . ." 42 U.S.C. § 2000d-1 (emphasis added); 45 C.F.R. § 80.8(c).
 
 
 75
 Further, the applicable law provides, in 45 C.F.R. § 80.2 that "(t)his regulation applies to any program for which Federal financial assistance is authorized to be extended to a recipient under a law administered by (HEW-45 C.F.R. § 80.13(a)), including the Federal assisted programs and activities listed (as) Appendix A of this regulation." (emphasis added). That Appendix comprehensively lists 186 areas wherein federal monies are either made available as part of a federal program (such as for research and related activities in education of handicapped children 20 U.S.C. § 1441 or for college work-study programs 42 U.S.C. §§ 2751-2757) or as part of continuing federal assistance to state administered programs (such as grants to states for vocational work-study programs 20 U.S.C. §§ 1371-1374). Indeed, a fair reading of the entire statutory and regulatory scheme bespeaks of a programmatic analysis in Title VI cases.[2]
 
 
 76
 Precedent also supports the programmatic approach required in Title VI cases. Contrary to the majority in this case, I believe the holding in and the spirit of Board of Public Instruction of Taylor County, Fla. v. Finch, 414 F.2d 1068 (5th Cir. 1969), require a programmatic analysis both during voluntary negotiation and later during the administrative compliance phase.
 
 
 77
 In the Finch case, Taylor County, Florida, received federal funds for use in its educational system under a number of federal grant statutes, e. g., Title II, Elementary and Secondary Education Act of 1965, 20 U.S.C. § 241a-m; P.L. 89-750, Basic Education for Adults, 20 U.S.C. §§ 1201-1213; and Title III, Elementary and Secondary Education Act of 1965, 20 U.S.C. §§ 841-848. A HEW hearing examiner, however, concluded that the Taylor County School Board was in violation of Title VI and therefore ordered that federal funds to the district be terminated. But the order was not:
 
 
 78
 . . . programmatically oriented, at least if the term "program" is understood to refer to the individual grant statutes under which aid was given to the Taylor County School District. . . . the termination of federal funds is not "limited in its effect" to one or more federally financed activities described in the grant statutes, but extends to "any classes of Federal financial assistance arising under any Act of Congress. . . .
 
 
 79
 414 F.2d at 1072 (emphasis in the original).
 
 
 80
 The Court of Appeals reversed the HEW hearing examiner's order holding that:
 
 
 81
 HEW was denied the right to condemn programs by association. The statute prescribes a policy of disassociation of programs in the fact finding process. Each must be considered on its own merits to determine whether or not it is in compliance with the Act. In this way the Act is shielded from a vindictive application. Schools and programs are not condemned enmasse or in gross, with the good and the bad condemned together, but the termination power reaches only those programs which would utilize federal money for unconstitutional ends. Under this procedure, each program receives its own "day in court".
 
 
 82
 414 F.2d at 1078 (emphasis added).
 
 
 83
 While the court in Taylor County did focus on the termination stage of the proceedings, there is no rational basis for distinguishing that stage of the proceedings from the voluntary compliance stage of the proceedings. This follows since the underlying thrust of Title VI requires HEW first to secure voluntary compliance eliminating discrimination if such a method is reasonably possible. 42 U.S.C. § 2000d-1; 45 C.F.R. §§ 80.6(a) and 80.8(c); Adams v. Richardson, 351 F.Supp. 636, 641-642 (D.D.C.1972); modified and aff'd, 156 U.S.App.D.C. 267, 480 F.2d 1159, 1163 (1973); Board of Public Instruction of Taylor County, Fla. v. Finch, supra at 1075, n.12; 1964 U.S.Code Cong. and Admin.News, at p. 2512; Remarks of Senator Pastore, 110 Cong.Rec. 7061 (1964); see also Taylor v. Cohen, 405 F.2d 277, 279 (4th Cir. 1968).
 
 
 84
 Explicit in any scheme of voluntary compliance is negotiation, Adams v. Richardson, 351 F.Supp. 636, 641 (D.D.C.1972), 45 C.F.R. § 80.7(d), and for meaningful negotiations to occur one must know what he is charged with in order to discuss his position intelligently. This allows the party charged with a Title VI violation to remedy the situation voluntarily. And many cases can be, and indeed should be, settled at this stage. Also, this spares the non-discriminating programs the wasteful counterproductive and unnecessary expense that attaches to being blindly drawn into an administrative proceeding that should not ultimately affect it anyway. It likewise dispenses with the harsh result that attends en masse terminations of federal assistance when wholesale cut-off of funding deprives those of federal funds who need them the most and whom Title VI was designed to protect.[3] See Board of Public Instruction of Taylor County, Fla. v. Finch, supra at 1075; United States Commission on Civil Rights, A Generation Deprived, Los Angeles School Desegregation, Chapter VIII, pp. 168-194 (1977); Remarks of Senator Pastore, 110 Cong.Rec. 7061 (1964).
 
 
 85
 Thus, the enforcement during the voluntary compliance phase in Title VI cases on a non-programmatic basis renders that statute, so applied, to be punitive in nature a result Congress clearly did not intend. Id.; 1964 U.S.Code Cong. and Admin.News, p. 2512; Remarks of Senator Pastore, 110 Cong.Rec. 7061-7063 (1964).
 
 
 86
 I further believe that the extensive legislative history reflected debates on the floor of Congress supports the requirement of a programmatic analysis during the voluntary compliance phase in Title VI cases.
 
 Senator Pastore observed that:
 
 87
 Title VI is not a device to terminate all federal aid to a state or community because there has been discrimination in one specific program. Therefore, the nondiscrimination requirements must relate directly to the particular program or activity against which they are imposed. Participation in one program would not justify the exaction of a nondiscrimination assurance concerning some other program. Similarly, any fund cut-off, or similar action, can be taken only concerning a program or activity in which discrimination has been practiced. Only the program in which discrimination has been practiced would be affected by Title VI.
 
 
 88
 88 Cong.Rec. 7059 (1964) (emphasis added).
 
 
 89
 In response to comments by Senator Ribicoff, Senator Pastore added that:
 
 
 90
 . . . the purpose of Title VI is not to cut off funds but to end racial discrimination. This requirement is reflected throughout the act. It is reflected in section 602 (42 U.S.C. § 2000d-1) which provides that any section taken by the Federal department or agency must be "consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." As a general rule, cutoff of funds would not be consistent with the objective of the Federal assistance statutes if other effective means of ending discrimination are available.
 
 
 91
 Section 602 (42 U.S.C. § 2000d-1), by authorizing the agency to achieve compliance "by any other means authorized by law," encourages agencies to find ways to end discrimination without refusing or terminating assistance. These careful safeguards certainly demonstrate that the proposed statute is not intended to be vindictive or punitive.
 
 
 92
 88 Cong.Rec. 7063 (1964) (emphasis added).
 
 
 93
 The commentary of Senators Humphrey, Javits and Moss also support the Pastore-Ribicoff programmatic interpretation which I believe is proper. Discussing § 602 of Title VI, Senator Humphrey reviewed the desired scheme of Title VI compliance thusly:
 
 
 94
 . . . (42 U.S.C. § 2000d-1) provides that any termination of federal assistance will be restricted to the particular political subdivision which is violating nondiscrimination regulations established under Title VI. It further provides that the termination shall affect only the particular program, or part thereof, in which such a violation is taking place.
 
 
 95
 88 Cong.Rec. 12714-12715 (1964) (emphasis added).
 
 
 96
 It is my view that Title VI is consistent with the opinion of the late President (Kennedy), because it would not authorize a general wholesale cutoff for federal expenditures, regardless of the purpose for which they were being spent. It would authorize action, including cutoff of funds where necessary, to end racial discrimination against the participants and beneficiaries of specific programs of federal financial assistance by way of grant, loan, or contract.
 
 
 97
 88 Cong.Rec. 8627 (1964) (emphasis added).
 
 Senator Javits carefully noted that:
 
 98
 (p)roponents of the bill have continually made in clear that, apart from all these safeguards against arbitrary action, it is the intent of Title VI not to require wholesale cutoffs of federal funds from all federal programs in entire states, but instead to require a careful case by case application of the principle of nondiscrimination to those particular activities which are actually discriminatory or segregated.
 
 
 99
 88 Cong.Rec. 7103 (1964) (emphasis added).
 
 
 100
 Finally, Senator Moss capsulized the programmatic requirement thusly:Involved here in Title VI is the very elementary and unassailable principle that federal funds are not to be used to support racial discrimination. Yet, before that principle is implemented to the detriment of any person, agency, or state, regulations giving notice of what conduct is required must be drawn up by the agency administering the program. These regulations can only reach racial discrimination which relates directly to the particular purpose of the program.
 
 
 101
 88 Cong.Rec. 6749 (1964) (emphasis added).
 
 
 102
 Beyond the statutory and regulatory framework, the precedent and the legislative history of Title VI, at least at the elementary and secondary levels of education, HEW's own forceful policy interpretation of Title VI requires a programmatic approach during voluntary negotiations toward compliance. Paragraph 22 of the pamphlet entitled Policies on Elementary and Secondary School Compliance with Title VI of the Civil Rights Act of 1964, issued by HEW's Office of Civil Rights, pursuant to 45 C.F.R. §§ 80.6(a) and 80.12(b), which governs HEW's enforcement of Title VI in the elementary and secondary school systems (and which is applicable to the City of Baltimore), provides quite succinctly that:
 
 
 103
 Where review of a school system indicates noncompliance with the Assurance of Compliance and Title VI, the Office for Civil Rights staff will make every reasonable effort to achieve compliance through negotiation.
 
 
 104
 The first formal step of such negotiation is a letter from the Office for Civil Rights to the school system identifying the particular areas of noncompliance, advising the system of its responsibility to prepare and submit to the Office for Civil Rights a plan for correcting the noncompliance promptly and effectively, and offering the school system assistance and guidance on the best manner to achieve compliance. If a school system submits a plan which is unsatisfactory in any respect, the Office for Civil Rights will inform the school system in detail and in writing of the areas in which the plan is not satisfactory.
 
 
 105
 If local officials so request, the Office for Civil Rights will at any stage of negotiation recommend in writing specific steps the school system may take to achieve compliance.
 
 
 106
 Quoted from Mandel v. U. S. Dept. of Health, Education and Welfare, 411 F.Supp. 542, 554 (emphasis added).
 
 
 107
 Since the policy pronouncement contained in Paragraph 22 of the OCR policy manual is merely declaratory of the programmatic approach to voluntary negotiations which I believe Title VI requires, as is set forth above, then like the district judge below, I would hold that HEW has thus failed to follow their own rules and regulations in contravention of the sound principles set out by Judge Winter in United States v. Heffner, 420 F.2d 809, 811 (4th Cir. 1970); See Mandel v. U. S. Dept. of Health, Ed. and Welfare, 411 F.Supp. 542, 553-554 (D.Md.1976).
 
 
 108
 Finally, I believe the programmatic approach retains the proper and logical evidentiary balance regarding the burden of going forward with the evidence in cases of this nature. Ordinarily, at the outset of the administrative process, the burden of producing evidence rests upon HEW to establish the discriminatory nature of a program. 5 U.S.C. § 556(d). When the agency has made a prima facie case, the burden of going forward with the evidence obviously shifts.
 
 
 109
 If we were to adopt a non-programmatic approach and fail to require HEW to specify the particular program, or part thereof arguably in noncompliance, then the evidentiary roles of producing proof would illogically be reversed. This would place an unreasonable burden upon the state, city or school board to prove a negative that is, the challenged entity, under pain of fund termination, would have to demonstrate the absence of discrimination in every program, activity and part thereof. To avoid this injustice, I would hold that HEW must "pinpoint" to the extent reasonably possible the precise program, or part thereof, which it contends is in noncompliance with Title VI. As above noted, this must be done prior to enforcement proceedings during voluntary compliance efforts.
 
 
 110
 Judge DONALD RUSSELL asks that I state that he concurs with the views expressed in my concurring and dissenting opinion.
 
 
 111
 While Judge WIDENER authorizes me to state that he concurs in this opinion, he yet believes that the reliance of the majority opinion on whether or not the Secretary must negotiate on a programmatic basis avoids discussion of the principal issue of the case.
 
 
 
 *
 Judge Craven died before the filing of the opinions which follow. Before his death, however, he concurred in the judgment and approved the language of Parts I and II of the majority opinion
 
 
 [1]
 The City's complaint was filed on January 8, 1976
 Between April 17, 1973 and May 5, 1975, the City negotiated with HEW concerning the desegregation of its elementary and secondary schools. On May 5, 1975, HEW, dissatisfied with the progress of the negotiations, filed a formal request for an administrative hearing (together with a recommendation that all federal financial assistance to the City school system be terminated.) II App. 163-73 (No. 76-1493).
 Administrative hearings were scheduled to begin on February 3, 1976, but were, of course, foreclosed by the district court's injunction. It is important to note that at the time of the City's complaint it was still at least three full steps away from an actual termination of federal aid: (1) an express finding by the administrative law judge that Title VI had been violated; (2) a written report to appropriate congressional committees; and (3) in all likelihood, judicial review (as a matter of right) of any determination adverse to the City's interests.
 The State's complaint was filed on January 5, 1976.
 Between March 12, 1969 and December 15, 1975, the State negotiated with HEW concerning the desegregation of its university system. On December 15, 1975, Martin H. Gerry, Acting Director of HEW's Office for Civil Rights, made the following comments in a letter addressed to Governor Marvin Mandel: (1) HEW was dissatisfied with the progress of negotiations to date; (2) the State was continuing to violate Title VI; and (3) pursuant to his authority, he would recommend that administrative hearings be commenced. I App. 150-53 (No. 76-1494). The district court's injunction prevented any formal request from being issued.
 It is clear that the State, at the time of its complaint, was still at least four full steps away from the termination of any federal aid: (1) a formal request for administrative hearings (together with HEW's request for sanctions); and steps (1) through (3), supra, noted in relation to the City's case.
 
 
 [2]
 McKart v. United States, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969); Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51, 58 S.Ct. 459, 82 L.Ed. 638 (1938); 3 K. Davis, Administrative Law Treatise § 20.01 at 56 (1958 ed.). See Johnson v. United States, 126 F.2d 242, 247 (8 Cir. 1942)
 The doctrine of exhaustion has long been part of federal jurisprudence, and is grounded upon a variety of reasons: respect for "administrative autonomy"; a desire that administrative "expertise and discretion" should first be brought to bear upon specialized problems; and conservation of judicial energies and resources. Nader v. Volpe, 151 U.S.App.D.C. 90, 466 F.2d 261, 266-68 & nn.32-42 (1972).
 
 
 [3]
 Nader v. Volpe, 151 U.S.App.D.C. 90, 466 F.2d 261, 268 (D.C. Cir. 1971). See Whitney National Bank v. Bank of New Orleans, 379 U.S. 411, 422, 85 S.Ct. 551, 558, 13 L.Ed.2d 386 (1965):
 (Where Congress) has created a specific statutory scheme for obtaining review, . . . the doctrine of exhaustion comes into play and requires that the statutory mode of review be adhered to notwithstanding the absence of an express statutory command of exclusiveness. Id.
 
 
 [4]
 See, e. g., Leedom v. Kyne, 358 U.S. 184, 188, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958) (district court had jurisdiction to award interim decree setting aside NLRB certification; NLRB found to violate express statutory command in the certification of bargaining units); Skinner & Eddy Corp. v. United States, 249 U.S. 557, 562-63, 39 S.Ct. 375, 63 L.Ed. 772 (1919) (district court had jurisdiction to award interim decree enjoining enforcement of ICC order; ICC found to have permitted new rate filings without hearings required by statute); American General Insurance Co. v. FTC, 496 F.2d 197, 200-01 (5 Cir. 1974) (district court lacked jurisdiction to enjoin FTC antitrust proceeding; FTC did not clearly violate a jurisdictional statute); Coca Cola Co. v. FTC, 475 F.2d 299, 303-04 (5 Cir.), cert. denied, 414 U.S. 877, 94 S.Ct. 121, 38 L.Ed.2d 122 (1973) (district court lacked jurisdiction to order joinder of parties in FTC proceedings; FTC did not violate any statutory command by refusing to join the parties); Taylor v. Cohen, 405 F.2d 277, 280-81 (4 Cir. 1968) (district court lacked jurisdiction to enjoin HEW enforcement proceedings; HEW fully complied with civil rights statute in ordering said proceedings); Elmo Division of Drive-X Co. v. Dixon, 121 U.S.App.D.C. 113, 348 F.2d 342, 344-45 (1965) (district court had jurisdiction to award interim decree enjoining continuation of FTC inquiry into objectionable advertising; FTC was required by statute to proceed by reopening an earlier case)
 
 
 [5]
 Put another way, "(t)he deeply established tradition is that courts are available to protect private parties against administrators who are acting in excess of their authority."
 K. Davis, Administrative Law Treatise § 21.00 at 677 (1970 Supp.).
 
 
 [6]
 This, in and of itself, contradicts a legal principle to which this circuit has long adhered. Federal agencies will be held to strict compliance with their own regulations and rules of procedure, when a failure to observe them results in prejudice to a party they were designed to protect. EEOC v. General Electric Co., 532 F.2d 359, 371 and n.37 (4 Cir. 1976); McCourt v. Hampton, 514 F.2d 1365, 1370 (4 Cir. 1975); United States v. Heffner, 420 F.2d 809, 811-12 (4 Cir. 1970)
 
 
 [7]
 Even without the guidelines, the City's obligations are far clearer than those of the State. With respect to elementary and secondary schools, desegregation efforts are governed by Brown v. Bd. of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) and its progeny. These cases, in and of themselves, establish "guidelines" that are unambiguous and direct. The legal responsibility of Baltimore City, under the Fourteenth Amendment, is "to come forward with a (desegregation) plan that promises realistically to work, and promises realistically to work now." Green v. School Board of New Kent County, 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). (Emphasis in the original.) This is because "the obligation of every school district is to terminate dual school systems at once and to operate now and hereinafter only unitary schools." Alexander v. Holmes County Board of Education, 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969)
 The situation with respect to Maryland is far more complex. In particular, we note the problems associated with institutions such as Morgan State University, which is predominantly black due to the voluntary self-selection of its student body. Black colleges serve a distinct social and cultural role, as suggested by the testimony given before the district court. It is apparent, therefore, that guidelines are needed most in the field of higher education, a field HEW has unjustifiably chosen to ignore.
 
 
 [8]
 See note 1, supra
 
 
 [9]
 See Wolf Corporation v. SEC, 115 U.S.App.D.C. 75, 317 F.2d 139, 143 (1963):
 (E)xcept in very unusual and limited circumstances Congress did not contemplate a grant of jurisdiction to the courts to prevent abuse or misuse of power by prior restraint of the exercise of the powers (of administrators) . . . . (S)uch relief is to be very sparingly applied and is limited to cases where on its face the contemplated hearing or other administrative process, if consummated, would be set aside on review on procedural grounds. Id. (Emphasis added.)
 
 
 [10]
 In discussing the thrust of Title VI, Senator Pastore noted that:
 In the House, a concerted attack was made on title VI as "punitive" or "vindicative." These charges are undeserved. These characterizations appear to result from a belief that title VI is intended to deny the South the benefit of social welfare programs that it would punish entire States for any act of discrimination committed within them. This argument merely befogs the issues. It ignores both the purpose of title VI and all of the limitations that have carefully been written into its language.
 As is clear, the purpose of title VI is to make sure that funds of the United States are not used to support racial discrimination.
 
 
 [110]
 Cong.Rec. 7062 (1964), as quoted in Bd. of Public Instruction of Taylor County, Fla. v. Finch, 414 F.2d 1068, 1075 n.11 (5 Cir. 1969)
 
 
 [11]
 Indeed, the entire Civil Rights Act of 1964 was adopted in response to the weakness of civil rights enforcement via piecemeal litigation in the federal courts
 (I)n the last decade it has become increasingly clear that progress has been too slow and that national legislation is required to meet a national need which becomes ever more obvious. That need is evidenced, on the one hand, by a growing impatience by the victims of discrimination with its continuance and, on the other hand, by a growing recognition on the part of all our people of the incompatibility of such discrimination with our ideals and the principles to which this country is dedicated. . . . H.R. 7152 (ultimately, the Civil Rights Act of 1964), as amended, . . . is designed as a step toward eradicating significant areas of discrimination on a nationwide basis.
 H.R.Rep.No.914, to accompany H.R. 7152, (1964) U.S.Code Cong. & Admin.News pp. 2391, 2393.
 Title VI, in particular, was necessary to rescue school desegregation from the bog in which it had been trapped for ten years.
 The Civil Rights Commission, doubtless better able than any other authority to understand the significance of the Civil Rights Act of 1964, had this to say about Title VI:
 This statute heralded a new era in school desegregation . . . . Most significantly . . . Federal power was to be brought to bear in a manner which promised speedier and more substantial desegregation than had been achieved through the voluntary efforts of school boards and district-by-district litigation. . . . With (federal) funds of such (great) magnitude at stake, most school systems would be placed at a serious disadvantage by termination of Federal assistance.
 United States v. Jefferson County Bd. of Education, 372 F.2d 836, 856 (5 Cir. 1966), aff'd in banc as modified, 380 F.2d 385, cert. denied sub nom., Caddo Parish School Bd. v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103, rehearing denied sub nom., East Baton Rouge Parish School Bd. v. Davis, 389 U.S. 965, 88 S.Ct. 324, 19 L.Ed.2d 382 (1967), quoting from the Report of the U.S. Commission on Civil Rights, Survey of School Desegregation in the Southern and Border States 1965-66, p. 2.
 
 
 [12]
 Adams v. Califano, Civ.Action No. 3095-70 (D.D.C. April 1, 1977) is the latest chapter in a related proceeding brought in our sister circuit. Adams v. Richardson, 351 F.Supp. 636 (D.D.C.1972); Adams v. Richardson, 356 F.Supp. 92 (D.D.C.), aff'd as modified, 156 U.S.App.D.C. 267, 480 F.2d 1159 (1973); Adams v. Weinberger, 391 F.Supp. 269 (D.D.C.1975)
 In Adams, suit was brought for declaratory and injunctive relief against the Secretary of HEW. The complaint alleged that HEW had done little or nothing to enforce Title VI since its adoption. The district court agreed, and, subject to some modification on appeal, HEW was ordered to undertake specific steps, vis a vis specific states and school districts, in order to effectuate Title VI compliance. The latest order issued in the Adams case, that of April 1, 1977, recognizes that any attempt to enforce Title VI in the area of higher education depends on a fundamental definition of compliance with the statute. Accordingly, the order requires HEW to draft higher education guidelines before any enforcement activity ensues (i. e., either negotiation or administrative hearings).
 
 
 [1]
 Section 2000d-6 of Title VI clearly expresses Congress' desire to achieve nationwide standards of uniform applicability:
 "(a) It is the policy of the United States that guidelines and criteria established pursuant to title VI of the Civil Rights Act of 1964 and section 182 of the Elementary and Secondary Education Amendments of 1966 dealing with conditions of segregation by race, whether de jure or de facto, in the schools of the local educational agencies of any State shall be applied uniformly in all regions of the United States whatever the origin or cause of such segregation.
 "(b) Such uniformity refers to one policy applied uniformly to de jure segregation wherever found and such other policy as may be provided pursuant to law applied uniformly to de facto segregation wherever found."
 
 
 [2]
 During the pendency of this appeal, HEW has in fact issued informal guidelines for the desegregation of State systems of higher education, pursuant to an order of the United States District Court for the District of Columbia in Adams v. Califano, 430 F.Supp. 118 (D.D.C.1977)
 The guidelines do not apply to the State of Maryland, because of the pendency of this litigation.
 
 
 [3]
 My agreement with the majority's affirmance in No. 76-1494 does not extend to its modification of the district court's injunction, from which modification I respectfully dissent. I think the administration of Title VI is a matter better left in the hands of the executive branch, here HEW, assuming its complies with the statute, than a federal appeals court
 
 
 [4]
 The issue of whether Title VI obligations can be imposed which are not adopted by rules, regulations, or orders of general applicability, approved by the President, was not raised or considered in Taylor v. Cohen, 405 F.2d 277 (4th Cir. 1968) (en banc). That case is therefore not controlling here. United States v. Mitchell, 271 U.S. 9, 46 S.Ct. 418, 70 L.Ed. 799 (1926); Webster v. Fall, 266 U.S. 507, 45 S.Ct. 148, 69 L.Ed. 411 (1925)
 
 
 [5]
 This is indicated clearly by correspondence found in the record between OCR Director Peter Holmes and Superintendent Patterson of the Baltimore School System. A letter from Holmes to Patterson dated April 17, 1973 states that if Baltimore had no schools in which a "20% disproportion" existed, the system would be unaffected by the order of the District of Columbia District Court in Adams v. Richardson, supra. If, however, one or more such schools was in operation, the city was called upon to submit to OCR "all relevant data and demographic and other information . . . concerning each of the schools in your district in which a '20% disproportion' exists, which would explain that disproportion or otherwise indicate your district's compliance with existing law."
 
 
 [1]
 The definition of "program" is discussed in Board of Public Instruction of Taylor County, Florida v. Finch, 414 F.2d 1068, 1076-79 (5th Cir. 1969). Rather than meaning an entire school program, as HEW argued, its meaning can be reduced to an individual grant that finances a project or activity, no matter how few people are involved. See also 45 C.F.R. § 80.13(g) (1976)
 
 
 [2]
 It has long been settled that "(s)tatutes which relate to the same person or thing, or to the same class of persons or things, or which have a common purpose are in pari materia, and it is a general rule that in the construction of a particular statute, or in the interpretation of its provisions, all other statutes in pari materia should be read in connection with it, as together constituting one law, and they should be harmonized, if possible." 82 C.J.S. Statutes § 366 (1953)
 
 
 [3]
 Federal funds are necessary to support the State's schools of: medicine, dentistry, nursing, and pharmacy. The Baltimore Cancer Research Center is similarly dependent. Much of this federal aid goes directly to minority students through student loans, work-study and grants. Mandel v. U. S. Dept. of Health, Education and Welfare, 411 F.Supp. 542, 560-61
 City programs affected by such a federal fund cut-off would be widely varied. They would include: "summer programs for exceptional and socially deprived children; staff development; programs for handicapped children; parent training; library resources; sickle cell anemia; projects for reading; science mathematical and vocational education; and work-study for low income students." Id., at 561.