Edmund S. TAYLOR, James H. Sikes, Ed Carter, and E. A. Hall, for themselves individually, and as parents and guardians of children attending the public schools in Richland County School District Number One, and for all other persons similarly situated, Appellees,

v.

Wilbur COHEN, as Secretary of the Department of Health, Education and Welfare and Harold Howe II, as United States Commissioner of Education, Appellants.

No. 12770.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 28, 1968.

Decided Dec. 5, 1968.

Gary J. Greenberg, Atty., Dept. of Justice (Stephen J. Pollak, Asst. Atty. Gen., Nathan Lewin, Atty., Dept. of Justice, and Klyde Robinson, U. S. Atty., on brief) for appellants.

Harold W. Jacobs, N. Welch Morrisette and Charles W. Knowlton, Columbia, S. C. (Frank B. Gary, and Boyd, Bruton, Knowlton & Tate, Columbia, S. C., on brief) for appellees.

Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN, WINTER, CRAVEN, and BUTZNER, Circuit Judges.

BUTZNER, Circuit Judge:

This appeal focuses on procedures for the termination of federal financial assistance under Title VI of the Civil Rights Act of 1964. It questions an injunction prohibiting the Department of Health, Education and Welfare from requiring a school district to assign pupils under any plan other than freedom of choice [1] and restraining the school board from adopting any other plan for the 1968–69 school year. We vacate the injunction and dismiss the complaint because we believe judicial intervention was premature.

I.

Richland County School District No. 1, which encompasses Columbia, South Carolina, and environs, receives approximately $2,000,000 of each year's funds from the federal government. It operates ten high schools, nine junior high schools, and forty-four elementary schools. Its 40,000 pupils are nearly equally divided between white and Negro. In the fall of 1964, twenty-two Negro pupils were admitted to formerly white schools. Prior to that time, the district had a completely segregated dual system. In 1965 the school board adopted a freedom of choice desegregation plan, which was approved by HEW. In the 1967–68 school year, 1,927 Negro pupils attended formerly white schools, and 3,135 Negro pupils were expected to enroll in them for the 1968–69 term.

In September 1967, officials of HEW advised the school board that its freedom of choice plan was not effective in achieving desegregation and that a new plan was necessary. During the following months the school board and HEW attempted, without success, to agree on a new plan. On April 22, 1968, HEW commenced administrative proceedings for the termination of federal funds and deferred consideration of funds for new programs. After further conferences, HEW suggested a zoning and pairing plan which the school board finally accepted. Later, however, severe public criticism of the new plan caused the board to reject provisions calling for the pairing of four schools. With this exception and other minor modifications, the district prepared to operate under the new plan in 1968–69.

In August 1968, parents of children attending some of the schools instituted this class action against the school board, the Secretary of HEW, and the Commissioner of Education. The complaint, invoking federal question jurisdiction [28 U.S.C. § 1331], alleged that the dis-

---

1. The freedom of choice plan allows pupils to choose annually among schools offering the grades for which they are qualified, subject to certain restrictions due to overcrowding.

trict's freedom of choice desegregation plan complied with the law and that the officials of HEW wrongfully coerced the school board to adopt another plan by threatening to terminate federal financial assistance. The district court, quite properly, took jurisdiction to hear the case because the controversy arose under the Constitution and laws of the United States. Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). After a hearing, the court found that freedom of choice was the best educational plan for the district and that HEW's efforts to force the school board to abandon it were *ultra vires*. It entered an interlocutory injunction restraining the school board and the HEW officials "from instituting or requiring the institution of a plan other than the 'Freedom of Choice' plan * * * for the school year 1968–69." At a special session of the court of appeals for this circuit, this order was stayed pending appeal.

## II.

Section 601 of Title VI of the Civil Rights Act of 1964 [42 U.S.C. § 2000d] provides:

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

In order to secure rights found in § 601, while at the same time protecting state agencies from unwarranted federal intrusion, Congress enacted a comprehensive plan of enforcement. Section 602 of the Act [42 U.S.C. § 2000d–1] provides that compliance with § 601 may be effected by the termination of federal assistance.[2] But before an agency can terminate financial aid, it must determine that compliance cannot be secured by voluntary means and must afford an administrative hearing which results in an express finding that the recipient has failed to comply. Even then, termination does not become effective until 30 days after the filing of a report with appropriate congressional committees. Congress erected further safeguards in § 603 [42 U.S.C. § 2000d–2] by providing for judicial review of departmental action.

The plaintiffs assert that the injunctive relief they seek can be obtained under the review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706. In Gardner v. State of Ala. for and in Behalf of Dept. of Pensions & Security, 385 F.2d 804 (5th Cir. 1967), cert. denied, 389 U.S. 1046, 88 S.Ct. 773, 19 L.Ed.2d 839 (1968), the relationship between the review under § 603[3] and that provided by the Administrative Procedure Act was thoroughly analyzed. The court reached the conclusion, with which we agree, that if specific statutes relating to programs receiving federal assistance afford review of agency action, then review under the Administrative Procedure Act

2. Section 602 [42 U.S.C. § 2000d–1] directs each federal department to issue regulations to effectuate the provisions of § 601 and makes failure to comply with these regulations a ground for terminating federal assistance. Pertinent HEW regulations are found in 45 C.F.R. Part 80. The validity of these regulations is not at issue.

3. Section 603 of the Civil Rights Act of 1964 [42 U.S.C. § 2000d–2] provides:
"Any department or agency action taken pursuant to section 2000d–1 of this title shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds. In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 2000d–1 of this title, any person aggrieved (including any State or political subdivision thereof and any agency of either) may obtain judicial review of such action in accordance with section 1009 of Title 5 [now 5 U.S.C. §§ 701–706], and such action shall not be deemed committed to unreviewable agency discretion within the meaning of that section."

is not available. Here 20 U.S.C. §§ 241k, 585, and 869 provide review of HEW's action. These statutes allow review of final action only.[4] Thus far HEW has taken only intermediate steps, including deferral of new applications,[5] consultation, and negotiation. Its submission of the question of the district's compliance to a hearing examiner merely set the administrative machinery in motion. Final action is the decision to terminate or continue financial assistance. Until this decision has been made, judicial intervention is not sanctioned by statute.

Similarly, equity affords no basis for restraining HEW's intermediate actions. The exceptional nature of prior restraint is described in Wolf Corp. v. SEC, 115 U.S.App.D.C. 75, 317 F.2d 139, 142 (1963):

"Judicial power to impose prior restraint is not called an extraordinary remedy without reason. Even as between private parties the ordinary remedy is legal action after injury. Prior restraint is granted only upon a strong showing and is subject to definite and well established limitations. Prior restraint against governmental action, regular on its face and under color of authority, is even more cautiously exerted. Still higher hurdles stand in the way of prior restraint against the processes of a regulatory body exercising quasi-judicial powers which can be judicially reviewed as a matter of right before they become final. In this third category the jurisdiction of the regulatory or administrative body is exercised within the framework of a statutory scheme in which it acts as an arm of Congress; moreover it has established patterns of procedure and acts in a context where courts have long acknowledged a considerable deference to the specialized experience and competence of such a body. To exert judicial power to stop processes of this third category, which can always be judicially reviewed when the story is fully told and recorded, is an extraordinary step in the usual as well as the legally artful sense of that word. * * *

" * * * [S]uch relief is to be very sparingly applied and is limited to cases where on its face the contemplated hearing or other administrative process, if consummated, would be set aside on review on procedural grounds."

The agency action set aside in Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.

4. Even if review were allowed under the Administrative Procedure Act, it, too, would be premature. 5 U.S.C. §§ 551(13) and 704.

5. Limitations on the authority to defer applications are set forth in 42 U.S.C. § 2000d–5:

"The Commissioner of Education shall not defer action or order action deferred on any application by a local educational agency for funds authorized to be appropriated by this Act, by the Elementary and Secondary Education Act of 1965, by the Act of September 30, 1950 (Public Law 874, Eighty-first Congress), by the Act of September 23, 1950 (Public Law 815, Eighty-first Congress), or by the Cooperative Research Act, on the basis of alleged noncompliance with the provisions of this subchapter for more than sixty days after notice is given to such local agency of such deferral unless such local agency is given the opportunity for a hearing as provided in section 2000d–1 of this title, such hearing to be held within sixty days of such notice, unless the time for such hearing is extended by mutual consent of such local agency and the Commissioner, and such deferral shall not continue for more than thirty days after the close of any such hearing unless there has been an express finding on the record of such hearing that such local educational agency has failed to comply with the provisions of this subchapter.

There has been no showing of a failure on the part of HEW to comply with this section. A timely hearing was scheduled for June 7, 1968. It was continued by stipulation.

Aside from the limitations contained in 42 U.S.C. § 2000d–5, here HEW's authority to defer applications for new programs raises no issues different from its authority to terminate federal aid. For this reason, it is unnecessary to treat authority to defer separately.

2d 210 (1958), on which the plaintiffs rely, differs from HEW's conduct here. In *Leedom* the National Labor Relations Board joined professional and nonprofessional employees in a bargaining unit without polling the professionals as the statute required. Because the NLRB had disregarded the procedure prescribed by statute, it was obvious that its action would have to be reversed upon review. Here, as we discuss in greater detail below, there has been no showing that HEW disregarded provisions of the Civil Rights Act of 1964.

We conclude, therefore, that neither a statutory nor an equitable basis exists for enjoining HEW's conduct at this stage of the proceedings. Judicial review must await the outcome of the administrative hearing.

### III.

As an additional ground for the maintenance of this action, the plaintiffs urge that the injunction they seek is not directed against HEW, but only against the officials of the department who have exceeded their statutory power. By this argument they seek to lift the bar of sovereign immunity. In determining whether the officials' acts were *ultra vires*, we apply the rule of Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 695, 69 S.Ct. 1457, 1464, 93 L.Ed. 1628 (1949): "[I]f the actions of an officer do not conflict with the terms of his valid statutory authority, then they are the actions of the sovereign * * *." [6] The fact that the officer may have erred in exercising discretion does not deny immunity to the sovereign. "If * * * he is to act in the light of the facts he ascertains and the judgment he forms, a court cannot restrain him from acting on the ground that he has exceeded his jurisdiction by reason of an error either of fact or law which induced his conclusion." Adams v. Nagle, 303 U.S. 532, 542, 58 S.Ct. 687, 693, 82 L.Ed. 999 (1938); see Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 690, 695, 69 S.Ct. 1457 (1949).

The main thrust of the plaintiffs' argument is that HEW officials exceeded their statutory authority by requiring the establishment of a unitary school system as a standard of qualification for federal funds. They contend that § 601 of the Act does not require abolition of a dual school system and that, therefore, it is not coextensive with the equal protection clause of the Fourteenth Amendment. We do not agree with this reasoning. In § 601 Congress sought to ban wrongs that result from the denial of the equal protection of the laws. Nothing in the Civil Rights Act of 1964 or its legislative history shows that Congress intended to appropriate money for any program that violates the constitutional rights of a citizen of the United States.[7] Green v. County School Bd. of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), and its companion cases, Raney v. Board of Educ. of Gould School Dist., 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968), and Monroe v. Board of Com'rs of Jackson, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968), dealt with the scope of the equal protection clause. In *New Kent* the Court held that a freedom of choice plan which perpetuated a dual system of schools was constitutionally deficient. It called upon the school board "to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." 391 U.S. at 437, 88 S.Ct. at 1694.[8]

---

6. *Larson* also interdicts unconstitutional action by an official. No claim of this kind is made here.

7. Proponents of the Civil Rights Act of 1964 held the view that "[T]itle VI is simply designed to insure that Federal funds are spent in accordance with the Constitution * * *." 110 Cong.Rec. 6544 (1964) (remarks of Senator Humphrey); see 110 Cong.Rec. 7057, 7062, 13333 (1964) (remarks of Senators Ribicoff and Pastore).

8. In *New Kent* 85% of the Negro pupils attended Negro schools. HEW's evaluation of Richland's freedom of choice plan was based on enrollment during the 1966–

School boards, HEW officials, and the courts recently have been admonished that a freedom of choice plan which delays rather than advances "conversion to a unitary, nonracial, nondiscriminatory school system . . . must be held unacceptable." Monroe v. Board of Com'rs of Jackson, 391 U.S. 450, 459, 88 S.Ct. 1700, 1705 (1968). Because their institution of termination proceedings was based on a judgment that the board's plan did not effectively eliminate the dual structure of the district's schools, the HEW officials did not exceed their authority under the Civil Rights Act of 1964. Whether the officials erred— whether they were accurate in their appraisal of the facts and correct in the remedy they suggested—does not determine the limits of their authority. Resolution of these issues must await final administrative action and judicial review in the manner prescribed by Congress. We hold, therefore, that this suit against the officials, which seeks prior restraint of administrative action as distinguished from judicial review, is in reality a suit against the United States, and the doctrine of sovereign immunity requires that we vacate the district court's injunction and dismiss the action. Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).

### IV.

HEW urges as an alternative defense the plaintiffs' lack of standing. Standing is one of "the most amorphous [concepts] in the entire domain of public laws."[9] It is not an absolute. It is a variable, closely related to the nature of the controversy and the relief sought.

Parents of children attending public schools are vitally interested in every phase of the school system, including its finances and plan of assignment. Nevertheless, they do not have standing to seek judicial interference with a school board's exercise of its discretionary power. On the other hand, parents do have standing to enjoin a board's unconstitutional action, whether it originates in the school board itself or is the product of pressure brought against the board by a government agency. Griffin v. School Bd. of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964). Here the constitutionality of the proposed change in the assignment plan is not challenged. The board's discretion to adopt the recommendation of HEW is undenied. The attack is mounted, instead, against the force that motivated the board—the threat of termination of federal funds. But this is in essence an indirect attack on the board's discretionary power, which the parents lack standing to pursue.[10]

Green Street Ass'n v. Daley, 373 F.2d 1 (7th Cir.), cert. denied, 387 U.S. 932, 87 S.Ct. 2054, 18 L.Ed.2d 995 (1967), involved the converse of the situation here. The Green Street Association, made up of individual homeowners and tenants, sought to enjoin the payment of federal money on the ground, among others, that the local agency was using the money in a discriminatory manner in violation of § 601 of the Act. In answer to this complaint, the court said:

"As to the federal defendants, the plaintiffs' argument is erroneous in that it ignores the remaining sections of Title VI of the act. Sections 602 and 603 of the act, 42 U.S.C. §§ 2000

---

67 and 1967–68 school years. Although a larger number of Negro pupils attended formerly white schools during the 1967–68 term, more than 87% of the district's Negro pupils still attended Negro schools.

9. Flast v. Cohen, 392 U.S. 83, 98, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968) (quoting Prof. Paul A. Freund).

10. The board, under circumstances not present in this case, could sue to prevent

the withholding of funds to which it is entitled. See Wolf Corp. v. SEC, 115 U.S. App.D.C. 75, 317 F.2d 139, 143 (1963) (dictum). And nothing we say about the parents' lack of standing is intended to foreclose their role as intervenors or *amicus curiae* in judicial review of HEW's administrative action.

d–1, 2000d–2, establish the procedure to be followed by federal officials in enforcing the nondiscrimination requirements of section 601. Only after the appropriate federal agency has followed this procedure is judicial review permitted by section 603. If an individual suit for an injunction against the federal officials were permitted, the administrative procedure would be bypassed. We do not think that section 601 was intended to permit the termination of federal participation in a given program by this means." 373 F.2d at 8.

*Green Street* and this case illustrate the tug of war that may arise over the grant or denial of federal financial assistance to the multitude of public programs to which § 601 applies. The merit in confining litigation to the public agencies was recognized in Johnson v. Chesapeake & Ohio Ry., 188 F.2d 458 (4th Cir.), cert. denied, 342 U.S. 833, 72 S.Ct. 43, 96 L. Ed. 630 (1951), where individuals sought to enjoin the abandonment of a ferry. There, after noting that the issue of abandonment had been committed by law to regulatory commissions subject to judicial review, the court denied the individuals standing and said:

"It [litigation by private interests] also would put upon the district courts the task of drawing fine lines in determining when a private claim is so special that it may be set apart from the general public interest and give the claimant power to litigate a public controversy. These inquiries are so harassing and unprofitable as to be avoided, unless Congress has explicitly cast the duty upon the courts." 188 F.2d at 459.[11]

 Finally, although this appeal was taken from an interlocutory injunction, this court has authority to decide the case, Myers v. Bethleham Shipbldg. Corp., 303 U.S. 41, 52, 58 S.Ct. 459, 82 L.Ed. 638 (1938); Smith v. Vulcan Iron Works, 165 U.S. 518, 17 S.Ct. 407, 41 L.Ed. 810

(1897); Wright, Federal Courts § 102 (1963), and dismiss it. It is clear that the exclusive procedure for judicial review prescribed by § 603, the defense of sovereign immunity, and the plaintiff's lack of standing require dismissal of this action. Dismissal, of course, is without prejudice to the school board's rights to pursue its administrative remedies and seek judicial review.

The order of the district court is vacated, and this action is remanded with the direction that it be dismissed.

11. Accord, Johnson v. Redevelopment *Agency of Oakland,* 317 F.2d 872, 874

(9th Cir.), cert. denied, 375 U.S. 915, 84 S.Ct. 216, 11 L.Ed.2d 154 (1963).